# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (the *"Agreement"*) is made and entered into as of _____ 4/10_____, 2012 by and between the LEON COUNTY EDUCATIONAL FACILITIES AUTHORITY, having its principal office at 3623 Robinhood Road, Tallahassee, Florida 32312 (the *"Authority"*), and ASSET CAMPUS HOUSING, INC., having its principal office at 675 Bering Drive, Suite 200, Houston, Texas 77057-2268 *{"Manager"):*

## WITNESSETH:

WHEREAS, the Authority is the owner of the Southgate Campus Centre, a student housing-facility located at the intersection of Jefferson and Gray Streets in Tallahassee, Florida (the *"Property"*), which Property was financed with the proceeds of the $25,435,000.00 Leon County Educational Facilities Authority Certificates of Participation, Series 1991 (the *"Certificates"*); and

WHEREAS, the Certificates were defeased with the proceeds of the $12,000,000 Leon County Educational Facilities Authority Revenue Refunding Bonds (Southgate Residence Hall Project) Series 1998A (the *"Series A Bonds"*) and the $20,500,000 Leon County Educational Facilities Authority Subordinated Revenue Refunding Bonds (Southgate Residence Hall Project) Series 1998B (the *"Series B Bonds"*) (the Series A Bonds and Series B Bonds together, the *"Bonds"*); and

WHEREAS, the owners of the Series A Bonds (the *"Series A Bondholders"*) and the owners of the Series B Bonds (the *"Series B Bondholders"*) (the Series A Bondholders and Series B Bondholders together, the *"Bondholders"*) have certain rights with respect to this Agreement as set forth in that certain Indenture of Trust dated as of May 1, 1998 by and between the Authority and SunTrust National Bank, Central Florida, National Association, as trustee for the Bonds (*"Trustee"*) (the *"Trust Indenture"*); and

WHEREAS, pursuant to Section 11.17 of the Trust Indenture, the Authority is required to employ a qualified management company to manage and operate the Property; and

WHEREAS, at the direction of the Bondholders the Authority wishes to retain Manager to manage and operate the Property, and Manager is willing to do so, all on the terms and conditions hereinafter set forth; and

WHEREAS, the Manager acknowledges all of the foregoing and accepts its appointment hereunder subject to the conditions specified in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and intending to be legally bound, consistent with Florida law and the Trust Indenture, the Authority and Manager mutually agree as follows:

EXHIBIT 3

ASSET_SCC 000001

## ARTICLE 1. BONDHOLDERS' RIGHTS

1.01    <u>Certain Definitions.</u>

(a) *"Bondholder Recommendation and Approval"* means the recommendation of the Majority of the Series B Bondholders with (i) the prior written consent of the Controlling Series A Bondholder if there is a Controlling Series A Bondholder or, (ii) if there is no Controlling Series A Bondholder, the prior written consent of the Majority of the Series B Bondholders; provided, however, that the Controlling Series A Bondholder shall not he obligated to accept the recommendation of the Majority of the Series B Bondholders.

(b) *"Controlling Series A Bondholder "*shall mean the person designated in Section 6.01 hereto as amended from time to lime in accordance with Section 6.02 herewith.

(c) *"Majority of the Series B Bondholders "*means the owners, as set forth on the Bond register, of a majority in outstanding principal amount of the Series B Bonds.

1.02    <u>Bondholder Recommendation and Approval Required</u>. The Authority may not take or omit to take any action or grant or withhold its consent or approval under this Agreement except upon Bondholder Recommendation and Approval. The Authority must take or omit to take any action or grant or withhold its consent or approval under this Agreement upon Bondholder Recommendation and Approval. The Authority must present prior written evidence to Manager that it has received Bondholder Recommendation and Approval, and Manager shall not he entitled to rely on any act, omission, approval, disapproval, consent or refusal of the Authority unless and until it has received such written evidence. Bondholders shall indemnify and hold harmless the Authority for any action taken or omitted by the Authority or in the Authority's name, where such action is taken or omitted by the Bondholders acting for or intending to bind the Authority without the specific approval and consent of the Authority, or where the Authority takes or omits to take such action solely upon Bondholder Recommendation and Approval. Such indemnification shall include reasonable attorneys' fees and costs incurred by the Authority, its members, staff, attorneys and other representatives.

1.02    <u>Bondholder Authorization</u>. If any approval, consent or authorization of the Bondholders is required pursuant to this Agreement, excluding "Bondholder Recommendation and Approval," such approval, consent or authorization shall be of the Controlling Series A Bondholder or, if there is no Controlling Series A bondholder, by the Majority of the Series B Bondholders. Notwithstanding, notification of the issue with respect to which Manager or Authority is seeking the consent, approval or authorization of the Bondholder shall be made to both the Controlling Series A Bondholder and the Majority of the Series B Bondholders.

1.03    <u>Third Party Beneficiaries</u>. The Bondholders shall be third party beneficiaries of this Agreement.

1.04    <u>Authorizations and Notice</u>. Any authorization, consent or approval by the Controlling Series A Bondholder under this Agreement shall be obtained from the representative as set forth in Section 6.01 hereof. Any authorization, consent or approval by the Majority of the Series B Bondholders shall be obtained from the Chairman of the Committee on Behalf of the Series 1998B Bonds as set forth in Section 6.01 hereof. Any notice to the Bondholders required hereunder shall be sent to both the representative for the Controlling Series A Bondholder and the representative of the Series 1998 B Bondholders Committee, each as set forth in Section 6.01

ASSET_SCC 000002

hereof.

## ARTICLE 1A. APPOINTMENT OF MANAGER

1.01A <u>Appointment of Manager</u>. The Authority, as directed by the bondholders, hereby appoints Manager and Manager accepts appointment as the sole and exclusive manager for the Property upon the terms and conditions set forth herein.

1.02A <u>Term of Agreement</u>. The primary term of this contract shall commence as of the first (1st) day of August, 2012, and shall expire on the thirty-first (31st) day of July, 2015, unless sooner terminated in accordance with the provisions hereof. This Agreement may be renewable for one additional year; provided that upon Bondholder Recommendation and Approval, upon expiration of this Agreement and a resulting vacancy in the position of manager, the Authority shall negotiate and enter into a new management agreement with the Manager.

1.03A <u>Account Agency Agreement</u>. Concurrently with the commencement of this Agreement, the Authority and Manager shall enter into the Account Agency Agreement, attached as Schedule A, pursuant to which Manager will open and/or maintain four (4) separate trust accounts for the Property. The first such account shall be designated the "Rent Payment Account" (herein referred to as the *"Collection Account),* and Manager shall deposit all rental income and other revenue due from or arising out of the operation of the Property into such Collection Account on a daily basis, as such revenue is received by Manager.   The second account shall be designated the "Operation and Maintenance Account" (herein referred to as the *"Operating Account),* and Trustee shall periodically deposit funds into such Operating Account in accordance with Section 5.02A of the Trust Indenture. Manager shall use funds in the Operating Account to pay all Operating Expenditures of the Property, as defined in Section 2.06 hereof, and any other costs relative to the Property as required by the terms of this Agreement. The third account shall be designated the *"Capital Expenditure Account,"* and Trustee shall periodically deposit funds into such Capital Expenditure Account periodically as required under the Approved Capital Budget, as described in Section 2.08 hereof. Manager shall use funds in the Capital Expenditure Account to pay for all capital acquisitions and improvements under the Approved Capital Budget. The fourth account shall be designated the *"Security Deposit Account"* and the Manager shall deposit funds into and withdraw funds from such Security Deposit Account in accordance with Section 2.04 herein.   All funds in the Collection Account shall be the exclusive property of Trustee, and Trustee shall have continuous access to such account, including but not limited to, signatory access. All funds in the Operating Account, Capital Expenditure Account and the Security Deposit Account shall be the exclusive property of Trustee, and Trustee shall have continuous access to such Accounts, including but not limited to, signatory access. Manager shall have concurrent signatory access to the Operating Account, the Capital Expenditure Account and the Security Deposit Account only. The Authority shall cause Trustee to provide Manager with monthly statements from all property-related bank accounts, and Manager shall reconcile such monthly statements.

The Operating Account authorized by the Account Agency Agreement shall be a non-interest-bearing checking account. If requested by the Authority, which request shall be made upon Bondholder Recommendation and Approval, in writing, Manager will transfer funds from the authorized bank account into an interest-bearing checking account at a depository institution as Trustee may, from time to time, designate. If an interest-bearing checking account is so requested, it will be designated as the Property's Operating Account for purposes of this Agreement.

3

1.04A <u>Independent Contractor Status</u>. Manager represents to the Authority that it is engaged in the business of managing properties as an independent contractor, and in that capacity, is serving as the property manager for the Property on behalf of the Authority. Manager shall not be liable for any obligation or expenditure incurred on behalf of the Property or on behalf of the Authority if Manager incurs such obligation within the scope of Manager's authority and pursuant to the Approved Operating Budget and the Approved Capital Budget. In contracting for services and products giving rise to the Operating Obligations, Manager shall be acting solely on behalf of the Authority, and the Authority agrees to indemnify, defend and save Manager, its principals and employees, harmless from and against all claims asserted and losses sustained by reason of such obligations (including reasonable attorneys' fees and court costs), so long as Manager performs its duties in good faith within the scope of this Agreement and so long as Manager's acts or omissions are not taken in violation of the covenants, duties and obligations to be performed by Manager under the terms of this agreement and do not constitute gross negligence, willful misconduct, malfeasance or fraud; provided, however, that nothing contained herein shall require the Authority to indemnify Manager for any liability arising from Manager's breach of its covenants, duties and obligations or the gross negligence, willful misconduct, malfeasance or fraud of Manager, its shareholders, principals, agents, officers, directors or its employees, and Manager hereby agrees to indemnify and hold the Authority harmless from any loss, damages, liability, cost or expense (including reasonable attorneys fees and court costs) which Authority may incur on account thereof. Manager shall advise any contracting party with whom it deals that Manager is acting on behalf of the Authority and that Manager shall have no liability for the obligation or expenditure, and may exact a commitment from the contracting party to look only to the Property or the Authority for payment. Neither this or any other provision of this Agreement shall be deemed to modify or expand the obligations and limitations thereon of the Authority as provided by Florida law and the terms of the Trust Indenture.

1.05A <u>Compliance with Building Regulations</u>. With respect to the Property, any structure on the Properly, or any equipment thereon, Manager shall, in a manner consistent with Section 2.16 herein, comply with the requirements of any building codes or with any statute, ordinance, law or regulation of any governmental body or official thereof, and to promptly notify the Authority and Trustee of any complaints, warnings, notices or summonses received by Manager relating to such matters. Manager shall not be obligated to initiate a process of discovery requiring environmental testing or inspections not normally performed in the routine operation of the Property, unless specifically requested to do so by the Authority in writing, which request shall be made upon Bondholder Recommendation and Approval, and at the Authority's expense. The Authority authorizes Manager to disclose the relationship of the Authority to the Property to any officials, and the Authority agrees to indemnify, defend and hold harmless Manager, its principals and employees, from and against all losses, costs, expenses, claims and liabilities whatsoever which may be imposed on or asserted against them by reason of any past, present or future violation, or alleged violation of any laws, ordinances, statutes or regulations, including, without limitation, environmental protection laws, unless any such violations, or alleged violations, are caused by the gross negligence, willful misconduct, malfeasance or fraud of Manager.

1.06A <u>Manager's Liability</u>. Manager assumes no liability whatsoever for any acts or omissions of the Authority, or any previous or subsequent owners or managers of the Property, or any agents or any previous or subsequent agents of either. Manager assumes no liability for any failure of, or default by, any tenant in the payment of any rent or other charges due to the Authority or in the performance of any obligations owed by any tenant to the Authority pursuant to any lease or otherwise. Manager assumes no liability for violations of environmental or other

4

building regulations other than (a) to exercise its best reasonable efforts to comply with such regulations and (b) to promptly notify the Authority and Trustee of violations or hazards discovered. Manager assumes no responsibility or liability for the provision of security services or devices other than to hire and supervise licensed or certified competent contractor(s) providing security services for the Property.

## ARTICLE 2. MANAGER'S DUTIES AND RESPONSIBILITIES

2.01   <u>Management Plans</u>. Manager shall prepare a *"Marketing Plan," "Operating Budget,"* and *"Capital Budget"*(collectively, the *"Management Plans")* for each fiscal year during the term of this Agreement and submit such Management Plans to the Authority, Bondholders and Trustee for approval at least forty-live (45) days prior to the beginning of such fiscal year. For purposes of this Agreement, "fiscal year" shall mean the twelve (12) month period commencing on August 1st of each year and ending July 31st of the following year.

Trustee shall review the proposed Management Plans and consult with Manager prior to the commencement of the forthcoming fiscal year in order to agree on an "Approved Marketing Plan," "Approved Operating Budget," and "Approved Capital Budget." Trustee shall approve or reject the Management Plans upon Authority, and Bondholder Recommendation and Approval. All Management Plans submitted to the Authority, Bondholders and Trustee for review shall be considered "Accepted and Approved" if there has been no specific written objection thereto from the Bondholders or Trustee within thirty (30) days from the date they were respectively submitted.

2.02   <u>Approved Marketing Plan</u>. The Approved Marketing Plan shall establish rental rates, rental terms, tenant concessions, the policy for dealing with and compensating outside (third party) brokers, and the method for implementation of marketing strategies for the Property, subject to the Approved Operating Budget. Manager shall supervise the preparation of all advertising layouts, brochures, campaigns, and model apartments. Advertising and promotional materials shall be prepared in full compliance with federal, state, and municipal fair housing laws, and Manager shall not use Authority's name in such advertising literature without Authority's prior written approval.

2.03   <u>Leasing</u>. Manager shall, in a manner consistent with Section 2.16 herein, obtain and keep suitable tenants in the Property and will cooperate with licensed brokers in reasonable manner to aid in filling any vacancy. Manager is authorized on behalf of the Authority, subject to the leasing parameters set forth in the Approved Marketing Plan, to negotiate, prepare, and execute all leases, including all renewals and extensions of leases and modifications of existing leases. Manager is not authorized to cancel any leases at the Property unless such cancellation (i) conforms to the guidelines set forth in the Approved Marketing Plan or (ii) is otherwise approved by the Bondholders (subject to Section 1.03 hereof). The standard lease forms to be used for the leasing of the Property shall be approved by the Bondholders (subject to Section 1.03 hereof) and shall be used by Manager with such nonmaterial modifications as the Bondholders (subject to Section 1.03 hereof) shall reasonably approve. The standard lease forms may be modified or replaced in their entirety by the Bondholders (subject to Section 1.03 hereof) from time to time. Manager shall execute leases and related documents on behalf of the Authority. The Authority shall maintain a current "Assumed Name" certificate on file under the name "Southgate Campus Centre," in the county where the Property is located. Notwithstanding the foregoing, Manager shall not renew or enter into any leases of vacant space with commercial or other non-student tenants without the prior approval of the Authority, such approval to be based on the Authority's sole determination that any such tenant would be compatible with the educational purposes of the facility and the Authority.

ASSET_SCC 000005

2.04   <u>Security Deposits</u>. Manager is authorized to establish requirements for security deposits, in accordance with the Approved Marketing Plan, and shall collect and refund security deposits in accordance with the applicable laws and the terms of each tenant's lease. Manager shall deposit security deposits into a separate account and, if required by law, pay tenants the interest earned on such deposit. When Manager deems appropriate, but only after first obtaining the written approval of the Bondholders (subject to Section 1.03 hereof), Manager may offset tenant charges with forfeited security deposit amounts and disburse any surplus security deposits from the Security Deposit Account.

2.05   <u>Collection of Rents and Enforcement of Leases</u>. Manager shall exercise its best reasonable efforts to promptly collect all rents and other charges for services provided in connection with the use or occupancy of the Property. All monies collected shall be deposited daily in the Collection Account in accordance with Section 1.03A of this Agreement. When directed to do so by the Authority, or if such actions are authorized in the Approved Marketing Plan, Manager shall institute the following actions: (a) terminate tenancies, (b) sign and serve such notices as are deemed necessary by Manager, (c) institute and prosecute actions to evict tenants, and recover rents and other sums due, and (d) settle, compromise and release such actions or suits or reinstate such tenancies. Reasonable attorneys' fees, filing fees, court costs and other reasonable expenses incurred in connection with such actions and not recovered from tenants shall be paid out of the Operating Account. Manager may select the attorney of its choice to handle such litigation unless otherwise directed by the Bondholders (subject to Section 1.03 hereof).

2.06   <u>Approved Operating Obligations</u>. The term *"Operating Obligations"* shall mean the aggregate of all obligations incurred by Manager, or any agent on its behalf, in connection with or arising from the ownership, operation, management, repair, replacement, maintenance, and use or occupancy of the Property including, without limitation, expenditures for any of the following: (a) license and permit fees, landowner association fees, real estate and personal property taxes and assessments, and all other charges of any kind and nature by any governmental or public authority; (b) all management fees set forth in Schedule D hereof and reimbursable expenses incurred by Manager as set forth in Schedule B; (c) advertising and marketing expenses and leasing fees and commissions; (d) legal, accounting, engineering and other professional and consulting fees and disbursements; (e) accounts payable to contractors and vendors providing labor, material, products, services and equipment to the Property; (1) premiums for insurance paid with respect to the Property or the operations thereof; (g) tenant improvements and property and equipment maintenance, repairs and replacements (including property used in connection with the Property) and segregated reserves therefore; (h) refunds of security or other deposits to tenants and contracting parties; (i) funds reserved for contingent or contested liabilities, insurance premiums, and other amounts not payable on a monthly basis; (j) service contracts and public utility charges and assessments; (k) personnel administration charges and pre-employment screening and testing costs; (1) onsite payroll costs including salary and wages, incentive bonuses, holiday and vacation pay, insurance benefits, workers' compensation premiums or allocable costs for self insurance of such matters, pension and health and welfare payments, payroll taxes and other governmental assessments so long as such salary and wage costs and benefits conform to the Approved Operating Budget; and (m) costs of credit reports, bank charges and like matters.   The payment of Operating Obligations shall constitute *"Operating Expenditures."*

2.07   <u>Approved Operating Budget</u>. The Approved Operating Budget shall constitute an authorization for Manager to expend the amounts approved from the Operating Account;

ASSET_SCC 000006

provided, however, no single expenditure made for these purposes shall exceed $2,500.00 without the Bondholders' prior written authorization (subject to Section 1.03 hereof). Manager shall exercise its best reasonable efforts to ensure that the actual costs of maintaining and operating the Property shall not exceed the Approved Operating Budget, and Manager shall explain to the Bondholders in writing each month significant year to date budget variances. If Manager becomes aware of an actual (or projected) net variance often percent (10%) or more in the Approved Operating Budget for any fiscal year, Manager shall explain the cause of the variance to the Bondholders in the form of a written report, make recommendations in such report as to curing the current variance and preventing future variances, and, if necessary after making a full analysis of the cause of the variance and possible remedies, submit to the Bondholders for their approval (subject to Section 1.03 hereof) in accordance with the timing and procedures set forth herein a revised Operating Budget for the remainder of such fiscal year. Notwithstanding the foregoing, Manager shall be authorized to exceed the $2,500.00 limitation in regard to items which are recurring line items in a budget approved by the Bondholders (subject to Section 1.03 hereof) (for example, and without limitation, if monthly utility costs and management fees for the Project exceed $2,500.00, Manager shall not be required to obtain a separate written authorization for the payment of such recurring line items).

In cases of emergency, Manager may make expenditures for repairs which exceed the spending limits set forth in the Operating Budget without prior approval from the Bondholders if such repairs, in the reasonable judgment of Manager, are necessary to prevent imminent damage to property or injury to persons. Manager will promptly notify the Authority and Bondholders of any such emergency expenditures no later than three (3) business days following such emergency repair, which notice shall describe the cause of the emergency, the repairs undertaken in connection with such emergency and the cost of such emergency repairs.

2.08    <u>Approved Capital Budget</u>. The Approved Capital Budget shall constitute an authorization for Manager to expend the amounts approved for capital acquisitions and improvements; provided, however, that any capital expenditure over $5,000.00 shall be awarded on the basis of competitive bidding, solicited in the following manner:

(a)    A minimum of three (3) written bids shall be obtained for each purchase where practicable.

(b)    Each bid will be solicited in a form so that, to the extent feasible, uniformity will exist in the bid quotes.

(c)    Manager shall be free to accept or reject any or all bids which are within the Approved Capital Budget for such capital expenditure; provided, however, that if such selected bid shall be in excess of $50,000.00, then the Authority's and Bondholders' consent to such bid (subject to Section 1.03 hereof) shall be required. If the Authority and Bondholders (subject to Section 1.03 hereof) shall not have objected to such bid or explicitly refused or denied its consent within thirty (30) days following the date on which Manager have sought such consent, such bid shall be deemed "Accepted and Approved."

Manager shall provide the Authority and the Bondholders with a copy of the bid that Manager accepted on behalf of the Authority. The Authority shall he responsible for capital expenses incurred in accordance with this Section 2.08 and may authorize payment by Manager out of available surplus funds in the Capital Expenditure Account.

ASSET_SCC 000007

2.9    Public Utility and Service Contracts. Manager shall negotiate and execute, on behalf of and in the name of the Authority, contracts for water, electricity, gas, telephone, television, vermin or pest extermination, and any other services which are, in Manager's opinion, reasonably necessary to properly serve and maintain the Property. All required utility deposits will be the responsibility of the Authority and each contract shall (a) be in the name of, and at the expense of, the Authority, (b) unless upon the written request of the Manager, the Authority, upon Bondholder Recommendation and Approval, agrees otherwise, include a provision for cancellation thereof by the Authority, upon Bondholder Recommendation and Approval, or Manager upon not more than thirty (30) days prior written notice, (c) require all contractors providing services to provide evidence of insurance as specified by the Authority and the Bondholders (subject to Section 1.03 hereof), and (d) be subject to bid under the procedure as specified in Section 2.08 if it requires monthly payments in excess of $5,000.00. Any discounts, rebates or commissions obtained in connection with any such purchases or service contracts shall be credited to the Operating Account.

2.10    Onsite Property Employees. Manager is authorized to screen, test, investigate, interview, hire, supervise, discharge and pay all personnel necessary to maintain and operate the Property, subject to this Agreement and the Approved Operating Budget. Alternatively, Manager may elect to contract with an employment contractor to provide the onsite employees for the Property and to conduct the employment-related functions referred to in the immediately preceding sentence, so long as such employment-related costs conform to the Approved Operating Budget. Such personnel shall in ever}' instance be employees of Manager (and/or of such employment contractor), and the Authority shall have no right to supervise or direct such employees; provided, however, that the selection of the property manager for the Property and senior corporate staff persons assigned to supervise the Property shall require the Authority's written approval, which shall be granted or withheld upon Bondholder Recommendation and Approval. Failure to obtain the Authority's written approval of the property manager and senior corporate staff persons as required by this Section 2.10 shall give the Authority the right to terminate this Agreement for cause under Section, 5.02 hereof. If the Authority alters any material instruction or direction given to the Property employees, or if the Authority assumes the supervision of the Property employees, then the Authority shall be liable and responsible for such action. The Authority acknowledges that all Property employees may not devote one hundred percent (100%) of their respective time to the operation of the Property; and, therefore, Property employees shall be deemed to be Property employees only to the extent of their respective time devoted to the Property, and the salary and fringe benefits of Property employees shall be commensurately prorated. Manager (or the employment contractor selected by Manager) assumes the responsibility for timely compliance with all applicable laws regarding Property employees, and in connection with such responsibility, Manager hereby indemnifies and holds the Authority harmless (or shall cause the employment contractor to indemnify and hold the Authority harmless) from any and all fees, expenses, lines and penalties which may be assessed against Manager (or the employment contractor) for any failure by Manager (or the employment contractor) to comply with employment-related laws and regulations. Except as set forth in the previous sentence, Manager (or the employment contractor) shall be reimbursed from the Operating Account for all costs related to pre-employment testing and screening and for all payroll-related costs pursuant to attached Schedule B to the extent such costs conform to the Approved Operating Budget.

2.11    Debt Service and Tax Payments. If requested by the Authority in writing, which request shall be made upon Bondholder Recommendation and Approval, and if sufficient funds are available in the Operating Account to satisfy all outstanding (and reasonably anticipated)

ASSET_SCC 000008

Operating-Obligations of the Properly, Manager shall apply any surplus operating funds to pay (to the extent of such surplus funds) the debt service and taxes due with respect to the Property pursuant to an order by or requirement of any federal, state, county or municipal authority, or other similar body having jurisdiction over the Property. Manager, however, shall not take any action under this Section 2.11 so long as Manager has been notified in writing that the Authority is contesting, or intends to contest, any such order or requirement. The Authority shall supply all information necessary for Manager to comply promptly with the requirements of this Section 2.11.

2.12    Financial Recordkeeping. Manager shall maintain, at Manager's premises and at the Property, all accounting records related to the Property based on the fiscal year. Manager shall use its own chart of accounts as approved by the Authority and Bondholders (subject to Section 1.03 hereof), and monthly financial statements will be cut off" on the last day of each month. Property revenues and expenditures will be accounted for on an accrual basis. Expense entries on the reports delivered to the Authority, Bondholders and Trustee will appear only as to expenditures for which Manager has received and processed invoices and other valid charges against the Property which, as of the date of the report, may be outstanding but not yet processed by Manager in the ordinary course of its business.

2.13    Financial Reports. Manager shall furnish those periodic reports of collections, disbursements, and other accounting matters listed on the attached Schedule C or which are otherwise agreed to by the Authority and Bondholders (subject to Section 1.03 hereof) and Manager. Such reports will be sent to the Authority, the Bondholders and Trustee not later than the fifteenth $(15^{th})$ day of each month and shall contain data and analysis with respect to the previous month's financial activities at the Property, as well as year to date reports. To support the monthly financial reports, Manager shall maintain, at a minimum, at Manager's premises and/or at the Property copies of the following:

(a)    Bank statements, bank deposit slips and canceled checks.

(b)    Comprehensive bank reconciliations.

(c)    Detailed cash receipts records.

(d)    Detailed cash expenditure/vendor records.

(e)    Summaries of adjusting journal entries.

(f)    Supporting documentation for payroll, payroll taxes and employee benefits.

(g)    Supporting documents for all fixed assets, including a detailed listing of all fixed assets.

2.14    [Intentionally Omitted]

2.15    Annual Audit. Within sixty (60) days following the conclusion of each fiscal year of the operation of the Property, in conjunction with the annual audit required under the Trust Indenture,

ASSET_SCC 000009

Manager shall cooperate with the Authority to cause to be completed an audit and examination of the books and records maintained by Manager for the Authority, and, as part of such annual audit, cause such auditing party to perform any and all audit tests relating to the activities performed by Manager for the Authority. Any and all such audits shall be conducted consistent with the terms of the Trust Indenture, either at the Property or at any office of the Manager, by an independent certified public accountant approved by the Authority; provided that the audit required hereunder shall be performed as part of the annual audit required under Section 11.22 of the Trust Indenture.

2.16 Management Duties and Operations. Manager, in fulfilling its duties and obligations under this Agreement, shall (1) operate, manage and lease the Property in the same manner as is customary and usual in the operation, management and leasing of comparable student residential and commercial facilities, (2) provide such services as are customarily provided by operators of such complexes of comparable class and standing as the Property, and (3) act solely with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of any enterprise of a like character and with like aims. In addition to the other obligations of Manager set forth herein, and consistent with but not in limitation of the foregoing, Manager shall render the following services and perform the following duties for the Authority:

(a)     coordinate the plans of tenants or subtenants for moving into or out of the Property, with a view towards scheduling such moves so that there shall be a minimum of inconvenience to other tenants;

(b)     maintain business-like relations with tenants, including, but not limited to, receiving, considering and recording tenants' service requests in a prompt and systematic fashion in order to show that the action with respect to each such request is consistent with the Authority's lease obligations;

(c)     use its best reasonable efforts at all times during the term of this Agreement to maintain the Property according to the highest standards achievable consistent with operation of comparable student residential and commercial complexes;

(d)     subject to the Management Plans, cause all such acts and things to be done in or about the Property as shall be necessary or desirable to comply with any and all laws, orders, rules and regulations, and, subject to Sections 2.07 and 2.08, to remove any and all violations affecting the Property placed thereon by any federal, state, county or municipal Authority having jurisdiction over the Property; provided that if the costs of compliance with any such order or to remove any such violation are in excess of the Approved Operating Budget and/or the Approved Capital Budget, but failure to comply would, in the reasonable judgment of Manager, expose the Authority or Manager to criminal liability, Manager may cause such order to be complied with or such violation to be removed in accordance with the provisions for emergencies set forth in Section 2.07;

(e)     cause to be prepared and filed all necessary forms relating to the maintenance and operation of the Property required by any federal, state, county or municipal authority;

(f)     cooperate with the Authority's accountants, auditors and other representatives in regard to the annual audit and periodic inspection of the books of account of the Authority;

ASSET_SCC 000010

(g)     cooperate with the Authority's accountants in regard to the preparation and filing on behalf of the Authority of all federal, state, city and other income or other tax returns required by any governmental authority (including the preparation and filing by Manager of any applicable IRS Form 1099 within the time required by law);

(h)     when the books of tentatively assessed valuations of the taxing authority having jurisdiction over the Property are opened for public inspection in each year, ascertain the assessment of the Property, report each assessment to the Authority, and if required by the Authority, cooperate with the Authority's attorneys and other representatives in the preparation of applications for correction of the assessed evaluation and/or tax liability;

(i)     promptly investigate and make a full written report to the Trustee, Bondholders, Authority and insurance carrier(s) as to all alleged accidents and/or alleged claims for damages related to the ownership, operation, management and maintenance of the Property (including, without limitation, any personal injury or property damage occurring to or claimed by any tenant or third party on or with respect to the Property) of which Manager becomes aware in the normal course of operation of the Property and the estimated cost of repair, and, in connection with this duty:

(i) Manager shall acquaint itself with all the terms and conditions of all insurance policies, cooperate with all insurance carriers, and shall do nothing to jeopardize the rights of the Authority and/or any other party insured under such policies; and

(ii) Manager shall forward to the insurance carrier any summons, subpoena or other similar legal documents served upon Manager with copies to the Bondholders, Authority and Trustee;

(j)     enforce any environmental clause in any lease and immediately notify the Bondholders, Authority and Trustee of any dumping, use or leakage of any applicable toxic waste or material in or near the Property of which Manager has knowledge;

(k)     cause an inventory to be taken at least annually of all major furniture, office equipment, materials, supplies, maintenance tools and any other major equipment or material belonging to the Property; and

(l)     set up and maintain orderly and accurate files containing rent records, leases and subleases, lease briefs (pursuant to the lease brief form upon which the Authority and Bondholders (subject to Section 1.03 hereof) and Manager shall agree), tenant improvements committed and made, leasing commissions paid or incurred, correspondence, receipted bills and vouchers and all other documents and papers pertaining to the Property and the operation and maintenance thereof, all of which shall at all times be the property of the Authority, and deliver such files to the Authority, with a copy to Trustee, promptly upon termination of this Agreement.

## ARTICLE 3. AUTHORITY'S DUTIES AND RESPONSIBILITIES

3.01 <u>Transfer of Operating Funds from Collection Account to Operating Account</u>. Subject to Section 5.02A of the Trust Indenture, Trustee shall disburse and transfer on a monthly basis from the Collection Account to the Operating Account funds sufficient to cover the then currently anticipated Operating Obligations and capital expenditures, as set forth in the Approved Management

ASSET_SCC 000011

Plans, for each upcoming monthly accounting and operating period. Such periodic transfer of funds from the Collection Account to the Operating Account shall occur by wire transfer or other appropriate means on or before the second (2nd) business day of each monthly accounting and operating period. If funds in the Operating Account become insufficient to cover all Operating Obligations and capital expenditures, the Authority agrees to, subject to the availability of such from funds held by the Trustee, within live (5) days after notice, cause sufficient funds to cover the deficiency to be deposited into the Operating Account. The Authority shall not be required to cause the transfer to the Operating Account of funds sufficient to cover any Operating Expenditures or capital expenditures which are in excess of ten percent (10%) over the applicable Approved Operating Budget or the Approved Capital Budget and shall do so only upon Bondholder Recommendation and Approval. If Operating Expenditures or capital expenditures are in excess of ten percent (10%) over the applicable Approved Operating Budget or the Approved Capital Budget, Manager shall provide the Authority, the Bondholders and Trustee with written variance reports explaining such variances in expenditures and providing recommendations to cure such variances. Manager shall not be obligated to advance its own funds on behalf of the Authority, or incur any liability in its own name.

3.02   <u>Manager's Compensation</u>. The Authority agrees to pay Manager for services rendered in managing the Property in accordance with the terms of this Agreement the fees specified in the attached Schedule D. Manager's Base Management Fee shall be paid from the Operating Account or, if necessary, funded pursuant to Section 3.01 above. Manager's Incentive Fee shall be paid only alter the completion of the annual audit described in Section 2.15 hereof.

Manager acknowledges that Authority shall have input into any bonuses paid by the Manager from the Incentive Management Fee.

3.03   <u>Manager's Costs to be Reimbursed</u>. The Authority agrees to promptly reimburse Manager for costs actually incurred by Manager in managing and leasing the Property in accordance with the terms of this Agreement, as specified in the attached Schedule B. Reimbursement of Manager shall be made from the Operating Account or, if necessary, funded pursuant to Section 3.02 above.

## ARTICLE 4. INSURANCE AND INDEMNIFICATION

4.01 <u>Property and Liability Insurance</u>. Consistent with Section 11.10 of the Indenture, Manager shall, on behalf of the Authority and at the Authority's expense, keep in force at all times insurance as specified by the Authority and the Bondholders (subject to Section 1.03 hereof) from time to time to protect the Authority and Manager against physical damage (e.g., fire with extended coverage endorsement, boiler and machinery) and against liability for loss, damage or injury to property or persons, which might arise out of the use, occupancy, management, operation or maintenance of the Property. Manager shall recommend to the Authority and the Bondholders the types and amounts of insurance coverage for the Property, and based upon such recommendations, the Authority and the Bondholders (subject to Section 1.03 hereof) will either approve such types and amounts of coverage or direct Manager to procure other types and/or amounts of coverage; provided that liability insurance must at least include (a) a commercial general liability policy which shall have bodily injury and property damage combined single limits of not less than $42,000,000 each occurrence, $2,000,000 aggregate, and (b) an excess liability (umbrella) insurance policy with bodily injury and property damage combined single limits of not less than $8,000,000. Such liability insurance shall be

ASSET_SCC 000012

deemed to be primary coverage over any general liability insurance carried by Manager and must cover claims asserted by reason of alleged wrongful actions, fault or negligence on the part of third parties and independent contractors, including persons employed by or acting on behalf of the Property and the Authority. Such insurance shall provide for the payment of all costs of defense of any claims. Any deductible required under such insurance policies shall be at the Authority's expense. The Authority shall be named as an additional insured on all such policies of insurance, and the Authority shall he listed as loss payee on all such policies of insurance. Manager may elect to maintain at Manager's expense, additional separate insurance to cover its own risks, and such insurance shall not be available to cover risks of loss or claims made against the Property or the Authority.

Liability insurance shall be written by a solvent and reputable carrier licensed to do business in the state in which the Property is located. Manager shall furnish to the Authority, with copies to the Bondholders and Trustee, certificates evidencing such insurance and duplicate copies of such policies within ten (10) days after the execution of this Agreement. The certificates evidencing insurance shall have attached thereto an endorsement from the actual policy that the Authority, Manager and Trustee shall be given at least thirty (30) days written notice (by certified mail) prior to cancellation, non-renewal, or any material change in the subject policy. If certificates of insurance are not furnished to the Authority (and copies of such certificates to the Bondholders and Trustee) within the time limits specified in this Section 4.01, or if any insurance coverage required hereunder is the subject of any notice of cancellation or default, or any change materially reducing the Authority's and Manager's protection there under and Manager fails to immediately take such action as may be necessary to continue or reinstate the required coverage, or, if any coverage is reduced below that which is required pursuant to this Agreement, the Authority, upon Bondholder Recommendation and Approval, shall secure the required insurance and direct that Trustee pay all premiums and acquisition costs therefore out of the Operating Account.

4.02   Workers' Compensation Insurance.   Manager shall maintain workers' compensation insurance (or a substitute form of insurance providing equivalent protection) covering all employees of Manager employed in, on or about the Property so as to provide statutory benefits required by state and federal laws. The Authority shall reimburse Manager for the cost of providing workers' compensation insurance pursuant to the attached Schedule B.

4.03   Fidelity Insurance. Manager shall maintain, at the Authority's expense, a comprehensive fidelity insurance policy to include depositors forgery in amounts of not less than $500,000 per employee of Manager. Such fidelity insurance policy shall be endorsed to provide that it may not be canceled or altered without thirty (30) days prior written notice to the Authority and Trustee.

4.04   Indemnification.

a)     The Authority and Manager intend to look initially to the insurance coverage required pursuant to Sections 4.01, 4.02 and 4.03 above for both legal defense and payment of any applicable claims, without regard to the following indemnities. The parties agree that, notwithstanding any indemnity language to the contrary, if a claim, liability, loss or expense arises which is covered by the insurance required pursuant to Sections 4.01, 4.02 and 4.03 above, the Authority and Manager shall cause such insurance to be paid in accordance with such policies, and to the extent of such payment, the indemnities provided below shall not apply. To the extent insurance is not available, or any claim is not fully paid by applicable insurance, the

13

ASSET_SCC 000013

parties agree that the indemnity provisions of this Section 4.04 shall control. As to any claims paid by insurance, the parties agree to waive all rights of subrogation, provided that such waiver does not invalidate any insurance policy or materially adversely affect the premium rates for such insurance.

b)      Subject to the limitations set forth in Section 1.04A hereof, the Authority shall indemnify, defend and hold harmless Manager, its principals and employees (collectively referred to as "Manager" for the purposes of this subsection 4.04(b)), from and against any and all claims, proceedings, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs of defense) incurred by or asserted against Manager as a result of any act or omission (or allegation thereof, including allegations of simple negligence) by (i) the Authority or (ii) Manager in its capacity as the property manager, including but not limited to, any liability for which insurance coverage is required pursuant to Section 4.01 above and not actually provided by the Authority. Notwithstanding the foregoing, Authority shall not indemnify Manager from and against acts or omissions constituting Manager's gross negligence, willful misconduct, malfeasance or fraud, except as covered by the insurance coverage required pursuant to Sections 4.01, 4.02 and 4.03, above and nothing in this Section 4.04 or elsewhere in this Agreement shall be construed to release or indemnify Manager from liability to the Authority for a breach or violation of any of the covenants, duties and obligations to be performed by Manager under the terms of this Agreement.

c)      Manager shall indemnify, defend and hold harmless the Authority and the Authority's officers, directors, employees, partners, principals, attorneys and agents (collectively referred to as the "Authority" for the purposes of this subsection 4.04(c)), from and against any and all claims, proceedings, liabilities, losses, costs and expenses (including reasonable attorneys' fees and costs of defense) incurred by or asserted against the Authority, to the extent not covered by the insurance coverage required pursuant to Sections 4.01, 4.02 and 4.03 above, as a result of any act or failure to act by Manager if it is determined that Manager acted in a manner volatile of any of the covenants, duties and obligations to be performed by Manager under the terms of this Agreement, or adjudged to constitute gross negligence, willful misconduct, malfeasance or fraud.

d)      All indemnifications set forth in this section or elsewhere in this Agreement inuring to the benefit of the Authority shall extend to and be deemed to encompass and apply to the Authority's members, staff, attorneys and other representatives.

4.05 Expenses of Litigation. Without limiting the foregoing, the Authority shall pay all expenses incurred by Manager, including, but not limited to, costs of defense and reasonable attorneys' fees, and any liability, lines, penalties or the like, in connection with (a) any claim subject to indemnity by the Authority under Section 4.04 and (b) any claim, proceeding or suit involving an alleged violation of any law, regulation or ordinance pertaining to fair employment, fair credit reporting, environmental protection, rent control, taxes or fair housing, including, but not limited to, any law, regulation or ordinance prohibiting discrimination on the basis of race, sex, sexual orientation, creed, color, religion, national origin or mental or physical handicap; provided, however, that the Authority shall not be responsible to Manager for any such claims or expenses if it is determined that Manager's violation of such law, regulation or ordinance was a result of the Manager's violation of any of the covenants, duties and obligations to be performed by Manager under the terms of this Agreement or due to Manager's gross negligence, willful misconduct, malfeasance or fraud .

ARTICLE 5. TERMINATION

5.01 Immediate Termination. Manager may terminate this Agreement upon five (5)

14

business days prior written notice to the Authority and Trustee if the Authority fails to cure a deficiency or to deposit sufficient funds in the Operating Account to cover all current Operating Obligations as required by Section 3.01 or if the Authority fails to pay the fees due to Manager in a timely manner, or fails to comply with each of its other obligations under this Agreement. Such notice to terminate shall not affect or impair any right which has accrued to either party prior to the date of such notice.

5.02    Termination for Cause. The Authority may terminate this Agreement for cause at any time during the term (or any renewal of the term) of this Agreement by giving Manager notice that the Agreement shall cease immediately upon Manager's receipt of such notice; provided that the Authority shall and may only terminate this Agreement for cause upon Bondholder Recommendation and Approval. After the termination of this Agreement pursuant to this Section 5.02, the Authority shall not be responsible or liable hereunder for the payment of any further fees, compensation or expenses to Manager, other than reimbursement of expenses properly documented and supported by invoices or receipts and any other fees accrued up to the date of such termination for cause. "Cause" includes Manager's (or Manager's employee's) gross negligence, willful misconduct, malfeasance or fraud or Manager's failure to fulfill any of its material obligations hereunder; provided that if Manager fails to fulfill any of its material obligations hereunder and such breach is curable, the breach shall not be considered "cause" hereunder unless and until the Bondholder or Authority have given Manager written notice of such breach and an opportunity to cure such breach within thirty (30) days following the effective date of such notice and Manager has not cured such breach within the thirty (30) day period.

5.03    Authority Responsible for Payments. The Authority shall be responsible for the direct handling and payment of invoices received after notice of termination; provided that to the extent of available operating funds in the Operating Account, Manager may, but shall not be required _to, continue to pay obligations incurred by the Property through the termination date, not including Manager's fees and reimbursements. Upon notice of termination, Manager shall submit to the Authority an estimate of the additional funds required to pay all Operating Obligations incurred by the Property through the termination date. The Authority shall promptly remit all additional funds required by such estimate, and Manager shall not be obligated to advance its own funds for payment of obligations incurred on behalf of the Property or the Authority.

5.04    Final Accounting.

(a)    Concurrently with the date of the termination of this Agreement, Manager shall deliver to the Authority (or shall relinquish its control over) all funds in all accounts related to the Property, including the Operating Account, the Capital Expenditure Account and any account for security deposits.

(b)    Within forty-five (45) days after termination, Manager shall deliver to the Authority, with copies to the Bondholders and Trustee:

(i)    A final accounting, reflecting the balance of income and expenses pertaining to the Property as of the date of termination.

(ii)    All original records, contracts, leases, receipts or deposits, unpaid bills and other papers or documents in Manager's custody or control necessary to the management of the Property.

ASSET_SCC 000015

5.05    <u>Manager's Retention of Copies</u>. Manager shall be entitled to retain copies of or have reasonable access upon request to all documents referred to in paragraph 5.04(b) (ii).

5.06    <u>No Waiver of Rights</u>. No termination of this Agreement shall operate to waive, diminish or impair any right that has accrued to either party to the date of termination, nor shall any termination under this Article V impair either party's right to indemnity under this Agreement.

ARTICLE 6. NOTICES, ETC.

<u>6.01 Notices</u>. All notices provided for in this Agreement shall be in writing and shall be given to the Authority, Trustee, the Bondholders or Manager at the address set forth below or at such other address as they individually may specify thereafter by written notice in accordance herewith.

|  |  |
|---|---|
| If to Authority: | Leon County Educational Facilities Authority<br>3623 Robinhood Road<br>Tallahassee, Florida 32312<br>Attention:   Executive Director |
|  | and |
|  | Terrell C. Madigan<br>Madigan Law Firm<br>PO Box 10321<br>Tallahassee, Florida 32302-2321 |
| With a copy to: | The Controlling Series A Bondholder<br>Invesco<br>1 Parkview Plaza<br>Oakbrook Terrace, IL  60181<br>Attention:   Account Manager |
| with an additional copy to: | The Committee on<br>Behalf of the Series<br>1998B Bonds<br>1 Retama Parkway<br>Selma, Texas 78154<br>Attention:   Committee Chairman |
| with an additional copy to: | US Bank Association, as Trustee<br>225 East Robinson Street, Suite 250<br>Orlando, Florida 32801<br>Attention:   Kathy Broecker |
| If to Manager: | Asset Campus Housing, Inc.<br>675 Bering Drive, Ste. 200<br>Houston, Texas 77057-2268<br>Attention: Michael S. McGrath |

ASSET_SCC 000016

Such notices shall be deemed effective upon actual delivery, or if mailed, certified return receipt requested, postage prepaid, properly addressed, three (3) days after posting.

6.02     Consents and Approvals. All consents and approvals and waivers required or asserted hereunder shall be in writing and signed by the party against whom such consent, approval, waiver or notice is urged; provided that no written consent or approval of the Authority or its representatives shall be required for any action that Manager may, in its reasonable good faith judgment, find it necessary to take in the event of an emergency. Each person listed in Section 6.01 hereto designates the person(s) listed in Section 6.01 as the person(s) from whom any consents or approvals required hereunder may be obtained. The Authority further agrees to give Manager notice of any change in the designations; provided that the Authority shall at all times designate at least one person from whom consents or approvals required hereunder may be obtained and shall furnish to Manager current information concerning the address and telephone number at which such person may be contacted at all times. Until Manager has received notice of such change, Manager shall be entitled to rely on any consents or approvals given by the previously designated person in connection with any matters hereunder.

6.03     Cooperation. The Authority shall keep Manager advised of its complete name at all times, including any change of such name. The Authority and Manager will cooperate to facilitate and promote the mutual objectives of managing the Property.

6.04     Assignment Manager may not assign this Agreement without the prior written consent of the Authority and the Bondholders (subject to Section 1.03 hereof). In addition, no assignment by Manager shall be effective unless (a) the assignee shall have first assumed, in writing, the obligations to be performed by the assignor, and (b) an executed copy of the assignment and assumption shall have been delivered to and approved by the Authority and Bondholders (subject to Section 1.03 hereof). The Authority may assign this Agreement without the Manager's consent; provided that the Authority may only assign this Agreement upon Bondholder Recommendation and Approval and must provide Manager with prior written notification and written evidence of Bondholder Recommendation and Approval of such assignment. No assignment by the Authority shall be effective unless the assignee shall have first assumed, in writing, the obligations to be performed by the assignor. Any permitted assignment shall relieve the assigning party from all further liability for performance hereunder except for obligations theretofore accrued or liabilities for acts or omissions that theretofore occurred or were omitted.

6.05     Pronouns. Where appropriate to the context, words of one gender include all genders, and the singular includes the plural and vice versa.

6.06     Amendments. Any amendment to this Agreement must be set forth in a written instrument duly executed by both the Authority and Manager and ratified by the Controlling Series A Bondholder and the Majority of the Series B Bondholders; provided that the parties may not modify the term of this Agreement as set forth in Section 1.02A hereof or Manager's compensation as currently set forth in Schedule D hereto, unless the parties first obtain the opinion of a nationally recognized bond counsel that the Agreement, as amended, will not cause the Bonds to become taxable.

6.07     Representations. Manager covenants, represents and warrants that it is fully

ASSET_SCC 000017

qualified to manage real estate such as the Property and perform all obligations, covenants and duties assumed by Manager hereunder. Manager agrees to comply with all applicable laws now or hereafter in effect. Manager represents that it is both competent and experienced in the field of management of student and residential and commercial properties of the type, size and class of properties similar to the Property. Manager has made no representations to the parties hereto except as are set forth herein.

6.8     Complete Agreement. This Agreement together with all schedules attached hereto and made part hereof supersedes all previous agreements, understandings and representations made by or between the parties hereto.

6.9     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida, without regard to conflict of law provisions. All obligations hereunder shall be deemed performable in Leon County, Florida.

6.10    Legal Construction. If any one or more of the provisions contained in this Agreement shall for any reason be held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalid provision shall be deemed severable and shall not affect the validity or enforceability of any other provisions of this Agreement, all of which shall remain fully enforceable.

6.11    Captions. The captions used in this Agreement are solely for convenience and shall not be deemed to constitute a part of the substance of the Agreement for purpose of its construction.

6.12    Competitive Projects. Manager may, individually or with others, engage in or possess an interest in any other projects and ventures of every nature and description, including, but not limited to, the ownership, financing, leasing, operation, management, brokerage, development and sale of real property and building projects other than the Property, whether or not such other ventures or projects are competitive with the Property; provided that Manager agrees that so long as it is the Manager hereunder, neither Manager nor any company or entity affiliated with Manager will engage in the development, managing or leasing of any other student housing project and/or of any other retail store(s) or food service outlet(s) which are equivalent to or competitive with the Property (a *"Competing Project)* located within a geographical area surrounding the Property within a radius of five *(5)* miles there from, unless Manager first obtains the written consent of the Authority and Bondholders (subject to Section 1.03 hereof). If Manager or any company or entity affiliated with Manager engages in the development, management and/or leasing of any Competing Project within such five (5) mile radius of the Property during the term of this Agreement without the prior written consent of the Authority and Bondholders (subject to Section 1.03 hereof), the Authority shall, upon Bondholder Recommendation and Approval, terminate this Agreement for cause pursuant to the provisions of Section 5.02 hereof.

6.13    Ratification. The Controlling Series A Bondholder and the Majority of the Series B Bondholders execute and bind themselves to this Agreement for the purpose of indemnifying the Authority and ratifying the Agreement and granting each of their approval and consent hereto as required by the Trust Indenture. By its execution of this Agreement, Controlling Series A Bondholder and the Majority of the Series B Bondholders assume no obligations hereunder other than such indemnification, ratification, approval and consent.

ASSET_SCC 000018

*Husman*

*713 268 5111*

IN WITNESS WHEREOF the parties have executed this Agreement the 10th day of
_April_, 2012, but effective as of the first (1st) day of August, 2012.

MANAGER:              ASSET CAMPUS HOUSING, INC.

                      By: _[signature]_
                          Name:  Michael S. McGrath
                          Title   President

Address:              675 Bering Drive, Ste. 200
                      Houston, Texas 77057-2268


AUTHORITY:            LEON COUNTY EDUCATIONAL
                      FACILITIES AUTHORITY

                      By: _[signature]_
                          Name: _Billy Hileman_
                          Title: _Chairman_

*Billy* ←

Address:              3623 Robinhood Road
                      Tallahassee, Florida 32312


CONTROLLING SERIES

A BONDHOLDER:         VAN KAMPEN HIGH YIELD MUNICIPAL FUND*
                      VAN KAMPEN STRATEGIC MUNICIPAL INCOME FUND*


                      By: _[signature]_
                          Name: _William D Black_
                          Title: _Vice President_

Address:              1 Parkview Plaza
                      Oakbrook Terrace, IL  60181

The Controlling Series A Bondholder is executing this Agreement solely for the purposes set forth in
Section 6.13 hereof.

*See Rider  1

19

**RIDER 1**

As provided for in Section 8.1 of the Agreement and Declaration of Trust of the Van Kampen Tax Free Trust (the "Trust") dated as of May 10, 1995 and further amended (under which the Trust is organized as a business trust under the laws of the State of Delaware and the Van Kampen Strategic Municipal Income Fund (the "Series") is organized as a series of the Trust), the shareholders, trustees, officers, employees, and other agents of the Trust and the Series shall not personally be bound by or liable for the matters set forth hereunder, nor shall resort be had to their private property for the satisfaction of any obligation or claim hereunder. A Certificate of Trust referring to the Agreement and Declaration of Trust of the Trust is on file with the Secretary of State of Delaware.

As provided for in Section 8.1 of the Agreement and Declaration of Trust of the Van Kampen Tax-Exempt Trust (the "Trust") dated as of May 10, 1995, as amended and restated as of June 21, 1995 and subsequently amended (under which the Trust is organized as a business trust under the laws of the State of Delaware and the Van Kampen High Yield Municipal Fund (the "Series") is organized as a series of the Trust), the shareholders, trustees, officers, employees, and other agents of the Trust and the Series shall not personally be bound by or liable for the matters set forth hereunder, nor shall resort be had to their private property for the satisfaction of any obligation or claim hereunder. A Certificate of Trust referring to the Agreement and Declaration of Trust of the Trust is on file with the Secretary of State of Delaware.

ASSET_SCC 000020

SCHEDULE A

ACCOUNT AGENCY AGREEMENT

This Account Agency Agreement is made by and between ASSET CAMPUS HOUSING, INC. *{"Manager')* and LEON COUNTY EDUCATIONAL FACILITIES AUTHORITY (the *"Authority').*

NOW, THEREFORE, the parties hereto agree as follows:

    1.   <u>Legal Authority</u>. The Authority represents and warrants to Manager that it has the legal right and Authority to enter into the Management Agreement between the parties hereto of even date herewith and that it is the owner of the real property commonly known as the Southgate student housing facility *("Property"),* located in Tallahassee, Florida. The Authority further represents and warrants to Manager that the Authority's Tax Identification Number is 59-3033117. The Authority shall immediately advise Manager in writing of any change in control of the Property or in the legal or assumed name of the Authority.

    2.   <u>Collection Account</u>. The Authority engages Manager to collect rents and other funds related to the Property, and Manager agrees to deposit, in trust for the benefit of Trustee, all collected funds related to the Property into a demand deposit account entitled the "Rent Payment" (herein referred to as the *"Collection Account")* with Trustee, a national banking association. Manager agrees that Trustee is the legal owner of all funds on deposit in the Collection Account (although such funds are held by Trustee for the benefit of the Bondholders), and Manager shall have no access to such Account or to the funds therein. Manager will not commingle any other funds with those maintained in the Collection Account.

    3.   <u>Operating Account</u> Manager shall maintain the demand deposit account entitled the "Operation and Maintenance Account" (herein referred to as the *"Operating Account').* Manager agrees that Trustee is the legal and beneficial owner of all funds on deposit in the Operating Account. Manager will not commingle any other funds with those maintained in the Operating Account and shall not withdraw any amounts there from except as provided herein or in that certain Management Agreement executed of even date herewith between Manager and the Authority (the *"Management Agreement').*

    4.   <u>Capital Expenditure Account</u>. Manager shall open and maintain the demand deposit account entitled the "Capital Expenditure Account." Manager agrees that Trustee is the legal and beneficial owner of all funds on deposit in the Capital Expenditure Account. Manager will not commingle any other funds with those maintained in the Capital Expenditure Account and shall not withdraw any amounts there from except as provided herein or in the Management Agreement.

    5.   <u>Security Deposit Account</u> Manager shall open and maintain the demand deposit account entitled "Security Deposit Account." Manager agrees that Trustee is the legal and beneficial owner of all funds on deposit in the Security Deposit Account. Manager will not commingle any other funds with those maintained in the Security Deposit Account and shall not withdraw any amounts there from except as provided herein or in the Management Agreement.

ASSET_SCC 000021

6.    <u>Operating Account, Capital Expenditure Account and Security Deposit Account Access</u>.

a.    Manager shall act as the paying agent for the Authority and, in the conduct of its business related to the Property, shall have the right to withdraw funds from the Operating Account, the Capital Expenditure Account and the Security Deposit Account in accordance with the Management Agreement, and Trustee may rely on the Authority's delegation of this right to Manager. In addition, Trustee shall have full power and authority to withdraw any and all funds deposited in the Operating Account, the Capital Expenditure Account and the Security Deposit Account, and upon doing so, will immediately notify Manager. Trustee shall have no liability to the Authority for any payment by Bank of funds on deposit in the Operating Account or the Capital Expenditure Account or the Security Deposit Account to or on behalf of Manager.

b.    The Authority shall rely exclusively on Manager to receive all correspondence and statements of information with respect to the Operating Account, and Bank may direct such correspondence and statements to Manager. Such information shall at all times be available for inspection and copying by the Authority.

7.    <u>Information Returns (IRS Form 1099MISC Reporting)</u>.

a.    Manager shall timely transmit to the Internal Revenue Service and to the payees appropriate Statements for Recipients of Miscellaneous Income for payments made from the Operating Account.

b.    Manager has the authority to sign the transmittal on behalf of the Authority.

c.    Manager has the responsibility, conferred on it by the Authority, to request the Tax Identification Numbers of recipients or others for whom information is being reported.

8.    <u>Termination</u>. This Agreement will terminate upon the termination of the Management Agreement and the relinquishment by Manager of its control over the Operating Account and the Capital Expenditure Account pursuant to Section 5.04(a) of the Management Agreement.

IN WITNESS THEREOF, the parties hereto have executed this Agreement by their duly authorized officers on _____4|10_____, 2012, to be effective as of August 1, 2012.

ASSET CAMPUS HOUSING, INC.

By: _____

Print Name: Michael S. McGrath

Title: President

Date: _3-30-2012_

LEON COUNTY EDUCATIONAL
FACILITIES AUTHORITY

By: _____

Print Name: Billy Hileman

Title: Chairman

Date: _4|10|2012_

23

## SCHEDULE B

## MANAGER'S COSTS TO BE REIMBURSED

     I.    Direct payroll costs of employees assigned onsite duties in accordance with the Approved Operating Budget:

          A.    Regular, overtime, and holiday pay
          B.    Incentive bonuses
          C.    Annual leave time (vacation and illness) allowed by Manager's employment policy

     II.    Payroll taxes and related personnel costs of employees assigned onsite duties at the Property at the actual cost thereof, which are subject to periodic change with written notice to the Authority of the effective date of such change. In no event will the amount charged by Manager for such payroll costs, taxes and employee-related benefits exceed those expenditures actually incurred by Manager (or by the employment contractor selected by Manager) on behalf of the Authority.

     III.    Cost of providing resident rent bills, vendor checks, envelopes and postage; and other materials supplied by the Manager as required for operation of the Property and billed at one dollar ($1.00) per tenant per month.

     IV.    Direct expenses of the Manager relating to the Property such as photocopying expenses special handling postage, and long distance phone charges.

     V.    Travel, lodging and meal expenses actually incurred by Manager, its officers, employees and agents in performing Manager's duties under this Agreement, (i) not to exceed $1,000.00 per month or $12,000.00 per fiscal year thereafter during the term of this Agreement without approval of the Bondholders (subject to Section 1.03 of the Management Agreement).

Initials: _____

Initials: _____

Initials: _____

24

SCHEDULE C

LIST OF PERIODIC ACCOUNTING REPORTS
AND PROPERTY OPERATING STATEMENTS

The following reports and operating statements are provided monthly:

1) Detailed Balance Sheet

2) Consolidated Income Statement/Budget Variance Report

3) Detailed Income Statement/Budget Report

4) Capital Expenditure Report

5) Property Rent Roll

6) Aged Delinquency Listing

7) Monthly Narrative of Leasing Efforts


The following reports and operating statements are provided upon Authority, Bondholder or Trustee request:

1) Detailed General Ledger

2) Copy of Bank Reconciliations and Supporting Bank Statement

3) Check Register

4) Report on Deferred Maintenance

ASSET_SCC 000024

*01:51:46 p.m   11-18-2013*

*Randall Husmann*
*713 268 5111*
*2 pps*

## SCHEDULE D MANAGER'S

## COMPENSATION

I.     Base Management Fee. Manager's base compensation for management of the Property shall be a fee (the *"Base Management Fee)* as follows:

**Three percent (3.0%) of gross monthly collections if occupancy is below 90%**

**In addition, the Owner agrees to pay, in arrears, an additional quarter percent (.25%) to the Agent as an incentive management fee if the property reaches between ninety-one percent (91%) and ninety five percent (94%) occupancy. If occupancy reaches 95% or greater, the fee will increase another quarter percent and remain at Three and One half percent (3.5%) of gross monthly collections, unless property falls below 95%.**

Payment of the Base Management Fee will be made from the Operating Account monthly beginning on August 1, 2012, and thereafter on or before the fifth (5th) day of each succeeding month during the term of this Agreement. Upon the termination of this Agreement on a day other than the last day of the calendar month, the Base Management Fee shall be prorated on a per diem basis up to the date of termination.

II.     Incentive Fees. In addition to the Base Management Fee (and any other fees paid to Manager and expenses reimbursed to Manager) and in order to provide incentive to Manager to generate increased revenue at the Property, the Authority hereby agrees to pay to Manager incentive fees (the *"Incentive Fees)* in the following manner:

**If the property should reach:**

**90% occupancy - $45,000.00 shall be paid to Manager**

**95% occupancy - $55,000.00 shall be paid to Manager**

The Authority shall pay the Incentive Fee for each fiscal year (or portion thereof) to Manager only upon completion of the annual audit (referred to in Section 2.15 of this Agreement) for the applicable fiscal year.

Initials: _____

Initials: _____

Initials: _____

ASSET_SCC 000025